IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| BORO CONSTRUCTION, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>LENAPE REGIONAL HIGH SCHOOL<br>DISTRICT BOARD OF EDUCATION,<br>et al,<br><br>       Defendants. | Civil No. 05-4689 (JEI/JS) |

## MEMORANDUM DECISION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Memorandum Decision serves as the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52, in connection with the parties' non-jury trial which occurred on September 21 and 22, 2010.[1]  Pursuant to 28 U.S.C. §636(c), the parties consented to the jurisdiction of this Court to preside over the trial.

Findings of Fact

    A.   General Background

1.  Plaintiff Boro Construction, Inc. ("Boro") filed its complaint against Lenape Regional High School District Board of Education ("Lenape") on September 27, 2005.  See Doc. No. 1.  Boro generally alleged that Lenape owed it money (i.e., retained balance) for the services Boro performed in connection with the construction of the new Seneca High School located in Tabernacle, Burlington

---

[1] The Court heard the testimony of James H. Hager, Drew Dingler, Dante Guzzi, William J. Mikula and Joseph DiGeronimo.

County, New Jersey.

2.     Boro is a Pennsylvania Corporation with its principle place of business in King of Prussia, Pennsylvania.  Lenape is a New Jersey public body with its principal place of business in Shamong, New Jersey.  Subject matter jurisdiction exists pursuant to 28 U.S.C. §1332 as Boro is a citizen of Pennsylvania and Lenape is a citizen of New Jersey, and the amount in controversy exclusive of interest and costs exceeds the sum of $75,000.

3.     On December 15, 2005 [Doc. No. 4] Lenape filed its answer to Boro's complaint and included a counterclaim.  Lenape's counterclaim alleged that portions of Boro's work was defective and negligently performed and that Boro breached its Contract with Lenape.

4.     Although at one time this litigation concerned numerous different areas of Seneca High School, the only remaining dispute between the parties involves the 400 meter running track ("Track"). The primary issue in dispute is whether the Track Boro arranged to build and line measured 400 meters.  Lenape does not allege that the Track was improperly constructed.

5.     On December 20, 2007, Boro filed a third-party complaint against DiGeronimo/Mikula Associates, LLC ("DMA") [Doc. No. 58]. Pursuant to its Contract with Lenape, Boro was responsible for the layout and original lining of the Track.  DMA was hired to layout the Track and then certify the Track after the lining was completed.

2

(N.T. 246:18-20).   Boro generally alleges that if Lenape's allegations as to the Track are true, then DMA is liable to it for contribution and/or indemnification because of DMA's failure to properly perform pursuant to the terms of DMA's oral agreement with Boro.

   B.   The Lenape/Boro Contract

   6.   On March 21, 2001, Boro contracted with Lenape to be the general contractor with regard to the construction of the new Seneca High School.  Joint Final Pretrial Order ("JFPO"), Stipulated Facts ¶2; Joint Exhibit ("JE") 1.  (Hereinafter "Contract").  Work began on March 23, 2001.  The Contract included the associated General Conditions and the specifications prepared by Lenape's architect, The Design Collaboratives ("TDC").  (N.T. 83:8-10).

   7.   The Contract included the construction of a 400-meter all-weather running track and all associated field events including high jump, long jump and pole vault areas.  See JE 2 at 2.

   8.   The Track was to be a "double bend" or "broken-back" configuration.  (N.T. 87:22-24).  This layout permits a full sized soccer field to be located within the running track.  (N.T. 90:16-20).  A traditional track has a single large half circle at both ends of the track.  The double bend or broken-back layout pulls the track to a greater width which results in a tighter radius at the ends of the straightaways.  The tighter radiuses are then joined by a longer, smoother radius at the far ends of the track.  (N.T. 91:6-

3

12).

9.   Six radius points were required to layout the Track. (N.T. 92:9-14).  (A broken-back curve design incorporates the use of six radii to form an elliptical curve instead of a more conventional two radii design).  TDC determined that the Contract required Boro to install radius monuments at the radius points. (N.T. 97:5-8).

10.  Specifications for the Track were included in Section 02970 Attachment "D."  (JE 4).  Part 1.3 of the specifications stated in pertinent part as follows:

    1.3 QUALITY ASSURANCE

        A.   Submit certification by installer of at least five previous installations of resilient exterior athletic surfacing.  Installer shall include list of contacts with telephone numbers.

           ...

        D.   Certification of Accuracy: The Contractor shall provide a plan at a scale of 1" = 20' signed and sealed by a licensed New Jersey Land Surveyor which certifies the exact measurements of the following for both the pre-construction and post-construction conditions:

           a.   Levels of the track, runway, approach and landing surfaces.
           b.   Permanent track measurements.
           c.   Start and finish lines.
           d.   Track lines.
           e.   Baton passing lanes.
           f.   Hurdle placements.
           g.   Radius Monuments.
           h.   Any and all other makings required by the Owner.

11.  With regard to the layout of the Track, the specifications

4

provided, <u>inter</u> <u>alia</u>:

    2.1 MATERIALS

        B. PRODUCTS

                6.    Track layout, length, lane width, number of lanes and events shall conform with the National Federation of State High School Association [NFSHSA].  Track markings shall be installed within a tolerance of 0.01' plus or minus.  A pre-striping meeting shall be held between the Contractor, Owner, Engineer to discuss layout and to accommodate specific requests.

            ...

    The Contractor shall submit the name and phone number of the licensed surveyor to be used for the certification of track striping.

(JE 4).

    12.  Section 3.2.G of the Track specifications required the following with regard to line markings:

        1.    Provide line markings for all 400m events.
        2.    Line paint shall be polyurethane-based paint compatible with the synthetic track surface.
        3.    All markings dimensions shall be certified in accordance with the governing sanctioning body (IAAF, NCAA, NFSHSA & USAT&F).

(JE 4).  The IAAF refers to the International Amateur Athletic Federation.  The NFSHSA refers to the National Federation of State High School Associations.

    13.  The parties stipulate that Boro retained DMA to certify that the Track met NFSHSA requirements for major events.  (JFPTO, Stipulated Facts, ¶3).  Boro entered into an oral agreement with DMA

5

to perform the required certification.  See JE 19.

14.  DMA is a consulting and engineering firm that specializes in the design and engineering of sports facilities.  The principals in DMA are Orion Mikula ("Mikula") and Joseph W. DiGeronimo ("DiGeronimo").  (N.T. 238:5-10).  Mikula is a professional engineer licensed in the State of New Jersey.  (N.T. 237:30-24).  DiGeronimo is not a licensed engineer and he is not a licensed surveyor.  (N.T. 264:11-13).  At all relevant times DMA did not have a licensed surveyor on staff.  (N.T. 242:24 to 243:2).

15.  DMA entered into an oral agreement with Boro and had no direct contractual relationship with Lenape.  Nevertheless, DMA knew that its work product would be used by Lenape.  (N.T. 319:13 to 320:1).

16.  On August 27, 2003, Boro advised TDC that it retained DMA. Id.  As of this date the Track was built but had not yet been lined. (N.T. 63:24-64:1).  Boro advised TDC that its letter served as Boro's "submittal of the name and phone number of the licensed surveyor who will provide the 'Certification of Accuracy'."  Boro attached to its letter DiGeronimo's five (5) page resume.  The resume did not indicate that DiGeronimo was a licensed surveyor.

17.  No one on behalf of Lenape, including TDC, objected to Boro's August 27, 2003 letter indicating DiGeronimo's services would be used.

18.  On August 28, 2003, TDC advised Boro that it would not make any additional payments for track construction until it

6

received the "'Certification of Accuracy' certifying the exact measurements of various aspects of both the pre-construction and post-construction condition of the track." (JE 20).

19. Boro was aware that Lenape took the position that the Contract required the provision of surveying services in connection with the construction of the Track. On October 22, 2002, TDC denied Boro's request (submitted by New Road) for $1,260 to provide surveying services. (JE 22). TDC advised New Road that Specification 02970 required the provision of surveying services with the pre-construction survey. (Id.) Boro did not provide Lenape with the pre-Construction Certification of Accuracy required pursuant to the Track specifications. (N.T. 28:16-19). Nevertheless, despite the fact that Lenape arranged for a construction management firm to be on site every day (New Road Construction Management Company), construction was permitted to proceed without the pre-construction survey of the Track. (N.T. 96:16-18; 100:15-18).

C. DMA's Layout

20. DMA laid out the Track to meet the standards of the NFSHSA and IAAF for a 400-meter broken back track layout. (N.T. 266:16 to 268:6). Boro subcontracted Tri-Tec, Inc. to stripe and mark the Track pursuant to DMA's layout. (N.T. 70:6-17).

21. In late March or early April of 2004, DiGeronimo went to Seneca High School to lay out the control points on the Track for Tri-Tec to paint the lane lines and event markings on the Track

7

surface.  (N.T. 272:5 to 279:11).

22.  In order to establish the control points (the points of curvature and tangency, and the curve radii), DiGeronimo attempted to locate the radius point monuments which were to have been previously set.  From those radius points DiGeronimo would follow the schematic diagram published by the NFSHSA and IAAF to place the control points for Tri-Tec to paint the event lines. (<u>Id</u>.)

23.  When DiGeronimo arrived at the Track he learned that the contractor had not set the monuments for the radius points. Therefore, he had to establish the initial control points from which he could establish the remaining points which Tri-Tec used for line painting.  (<u>Id</u>.)

24.  After establishing the control points and radius distances, DiGeronimo completed the layout, and Tri-Tec then painted the lane lines and event markings onto the surface of the Track. (N.T. 301:1-20).

25.  After the line painting was completed, DiGeronimo returned to the Track and confirmed that the Track was painted in accordance with his layout.  (N.T. 304:17 to 305:22; 319:1-4).

26.  On April 5, 2004 DMA issued its Certification of Track Markings whereby DMA certified that the Track marking system of the Seneca High School Track was in compliance with all requirements of the NFSHSA for major events.  (JE 6).  The Certification of Track Markings is signed by DiGeronimo and Mikula.  The Certification stated, <u>inter</u> <u>alia</u>:

DiGeronimo Mikula Associates, L.L.C. (DMA) personnel conducted field inspection and markings survey at the Seneca High School Track and Field Facility. The purpose of the survey was to layout and certify the new metric track events based on the installation results.

The Standard Method, as defined by the National Federation of State High School Associations (NFSHSA) for Certification of Metric Markings for All-Weather Track Surface Systems was followed. The layout was performed by this office and the painting was performed by Tri-Tech, Inc. of Rockford, Illinois.

Certification of Markings

The Track configuration is as follows:
       a.   Elliptical Turns (Broken Back) Layout
       b.   400 Meter Distance
            •   Large Radii are 191.00 feet
            •   Small Radii are 96.00 feet
            •   Length of Straight-aways 255.07 feet

The track marking system is in compliance and meets all requirements of the NFSHSA for major events.

(JE 6). DMA did its measuring with a theodolite and a tape measure. (N.T. 278:17-20).

27. According to DMA it certified that the Track was 400-meters in length along the measure line and that all distances, angles, radii and event markings were in compliance with NFSHSA and IAAF requirements. (N.T. 286:14-20; JE 6).

28. In addition to the dispute as to the length of the Track, TDC did not believe DMA's Certification met the requirements of Lenape's Contract because no plan to scale drawing was provided and there was no certification from a licensed land surveyor. (N.T. 108:2-1).

       D.   Retention of Guzzi

29. After the Track was built and marked, Lenape asked Dante

9

Guzzi Engineering Associates, L.L.C. to survey the Track and the painted lines to determine if the Track met the installation specifications. <u>See</u> June 21, 2004 Fax, JE 7. Guzzi opined that the Track was incorrectly lined. <u>See</u> JE 23.

30. Guzzi prepared a May 26, 2005 report for Lenape concluding that the Track as laid out by DMA and striped by TriTec was "approximately 1 to 1 ½ meters long per lap." <u>See</u> JE 8. Guzzi's conclusion for why this occurred is set forth in his letter:

> Based on our detailed measurements of the line striping, it appears that the inside Measure Line was probably laid out on the track surface prior to striping, the striping contractor utilized this as the lane stripe instead. Unfortunately, this error impacts each lane and almost every racing event, and renders the track un-certifiable. Fortunately, the track surface is large enough to accommodate several fixes.

31. Based on the foregoing, Guzzi opined that the Track as laid out by DMA was not certifiable under the rules of any governing body. (N.T. 354:11-14). In order to correct the alleged error Lenape decided to apply two new spray coats of EPDM structural spray to the Track and re-strip the lines. (JE 8).

32. DiGeronimo inspected the re-striped Track in November 2009. During the inspections he was able to see the original painted lines as he previously laid them out. (N.T. 292). He opines that DMA's original layout was correct. DiGeronimo also opines that the current Track layout is 3.29 feet short of 400 meters. (N.T. 298:3-5).

33. DiGeronimo believes there are two reasons why the Track

as currently lined does not meet NFSHSA requirements.  The first reason is because the Track does not measure 400 meters from the measure line.  The second reason is the radius or radii angle is greater than 60 degrees.  (N.T. 334:14 to 335:4).

34.  Lenape argues Boro breached the Contract because Boro did not provide a Track that met the specifications in the Contract. Lenape also argues Boro breached the Contract by not repairing the allegedly non-conforming Track.

E.   Damages

35.  Boro claims that Lenape is retaining $10,916.61 owed under their Contract.  Boro and Lenape stipulate that if the Court finds that the original Track was properly striped and Boro's claim against DMA is unsuccessful, then the retained balance of $10,916.61 should be paid by Lenape to Boro.

36.  Lenape is seeking to recover from Boro total damages in the amount of $89,587.89.  Lenape and Boro stipulate that Lenape paid $63,750 to resurface and reline the track.  Albeit, Boro denies the work was necessary.  Although Guzzi claims he was paid approximately $24,000 in connection with his work, Lenape is only seeking to recover an engineer's fee of $16,157.75.  The foregoing two amounts total $79,907.75.  Lenape is seeking a 10% overhead charge in the amount of $7,990.78.  Lenape's damage claim for the track resurfacing and relining, and Guzzi's engineering work, together with the 10% overhead charge, totals $87,898.53.

37.  Lenape is also seeking to recover $1,535.69 for the amount

11

it paid for the survey of the track arranged by Guzzi. Lenape
claims a 10% overhead charge on this work for a claim of $153.57.
The total amount Lenape is claiming for the survey it arranged is
$1,689.26.

38.   Lenape's 10% overhead charge is not provided for in the
Contract.  (N.T.80:13-19).

39.   Lenape's total damage claim is $89,587.79 ($87,898.53 +
$1,689.26).

Conclusions of Law

1.   In New Jersey, the basic elements of a contract are
offer, acceptance, and consideration.  McNutt v. Estate of McNutt,
No. 3:09-cv-2 (FLW), 2009 WL 3756907 (D.N.J. Nov. 6, 2009)(citing
Contl. Bank of Pa. v. Barclay Riding Acad., Inc., 93 N.J. 153, 170
(1983), cert. denied, Barclay Equestrian Ctr., Inc. v. Contl. Bank
of Pa., 464 U.S. 994 (1983); Friedman v. Tappan Dev. Corp., 22 N.J.
523, 531 (1956)).  "A contract arises from offer and acceptance, and
must be sufficiently definite that the performance to be rendered
by each party can be ascertained with reasonable certainty."
McNutt, supra, at *4 (citing Weichert Co. Realtors v. Ryan, 128 N.J.
427, 435 (1992); West Caldwell v. Caldwell, 26 N.J. 9, 24-25
(1958)(internal quotation marks omitted)).  "A plaintiff alleging
breach of contract must establish: (1) the existence of a valid
contract between plaintiff and defendant; (2) that defendant
breached the contract; (3) that plaintiff performed his or her
obligations under the contract; and (4) resulting damages." Ford

12

Motor Co. v. Edgewood Prop., Nos. 06-1278, 06-4266 (HAA), 2009 WL
150951, at *4 (D.N.J. Jan. 20, 2009) (citing Video Pipeline, Inc.
v. Buena Vista Home Entm't, Inc., 275 F. Supp.2d 543, 566 (D.N.J.
2003), aff'd, 342 F.3d 191 (3d Cir. 2003)). "A plaintiff cannot
meet the burden of establishing these elements by merely making
conclusory allegations." Id. (citing In re Nice Sys., Ltd. Secs.
Litig., 135 F. Supp. 2d 551, 565 (D.N.J.2001)). "[T]he burden of
establishing a breach of contract rests with the party who asserts
the breach; a breach of contract will not be presumed." Nolan v.
Control Data Corp., 579 A.2d 1252 (N.J. Super. App. 1990)(citing
Doyle v. Northrop Corp., 455 F. Supp. 1318, 1329 (D.N.J. 1978);
Shapiro v. Solomon, 42 N.J. Super. 377, 386 (App. Div.1956)).

    2.   Lenape argues Boro reached its Contract in three respects:
(1) Boro did not provide a pre-construction survey; (2) Boro did not
provide a post-construction survey; and (3) the Track as originally
built and lined did not meet NFSHSA requirements, i.e., it measured
more than 400 meters.

    3.   As to Boro's first argument regarding the failure to
produce a pre-construction survey, the Court finds that Boro did not
provide the Certification of Accuracy pursuant to the Lenape/Boro
Contract.   The Court finds that the Contract required Boro to
provide a plan to scale signed by a licensed surveyor.  See JE 4 at
Section 1.3.D.   Nevertheless, the Court also finds that Lenape
waived its contractual right to insist upon the enforcement of this
condition.  "[W]aiver involves the intentional relinquishment of a

13

known right and, thus, it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." <u>Petrillo v. Bachenberg</u>, 623 A.2d 272, 275-76 (App. Div. 1993), <u>aff'd</u>, 139 N.J. 472 (1995)(citing <u>Shebar v. Sanyo Business Sys. Corp.</u>, 111 N.J. 276, 291, 544 A.2d 377 (1988)). "Waiver must be evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." <u>Id</u>. (citing <u>Country Chevrolet v. North Brunswick Planning Bd.</u>, 190 N.J. Super. 376, 380, 463 A.2d 960 (App. Div. 1983)). "Waiver implies an election by the party to dispense with something of value or to forego some advantage which that party might have demanded and insisted upon. It must be supported by either an agreement with adequate consideration, or by such conduct as to stop the waiving party from denying the intent to waive." <u>Id</u>. (citing <u>West Jersey Title and Guaranty Co. v. Industrial Trust Co.</u>, 27 N.J. 144, 152-53 (1958)). As noted in the foregoing Findings of Fact, at all relevant times Lenape knew that Boro did not provide the contractually required pre-construction survey. Lenape waived its right to insist upon the performance of this contractual requirement by permitting Boro to proceed with its work when it knew that the required pre-construction survey was not produced. Dingler admitted that the construction of the Track proceeded despite the lack of a pre-construction survey. (N.T. 100:15-18). As early as October 11, 2002, TDC advised New Road that Boro should provide a pre-construction survey. JE 15. <u>See also</u> JE 22. In view of the

14

retention of TDC and New Road, and their active involvement with the construction of the Track at all relevant times, Lenape was aware that the pre-construction survey was not produced. Lenape's failure to enforce the contractual requirement of a pre-construction survey resulted in a waiver of the contractual right.

4.    As to Boro's second argument, the Court also finds in Boro's favor.  Section 1.2.D of the Contract required Boro to produce a post-construction plan at scale prepared by a licensed surveyor.  Although DMA produced its April 5, 2004 Certification of Track Markings (JE 6), this Certification was not prepared by a licensed surveyor.  Thus, Boro did not fulfill an element of its Contract.  In order to remedy Boro's oversight, Lenape hired Guzzi to arrange for a survey.  See JE 26.  The cost of the work was $1,535.69 plus Lenape's claimed 10% overhead charge of $153.57. Nonetheless, the Court will not award a judgment in Lenape's favor for the cost of Guzzi's survey because, as will be discussed infra, the Court finds that the survey was not accurate.  The Court will not direct Boro to pay for a survey that it finds was not accurate.

5.    As the parties recognize, the crux of the case relates to Lenape's third argument regarding whether Boro breached its Contract to build Lenape a 400-meter track that met applicable NFSHSA and IAAF standards.  Lenape relies upon Guzzi's testimony to support its contention that there was a breach.  Boro relies upon DiGeronimo's testimony to support its defense that there was no breach.  Since the parties dispute whether Guzzi and DiGeronimo are qualified to

15

render an expert opinion on the length of Lenape's Track, the court will address the qualification issue.

6.   Following the voir dire of Guzzi and DiGeronimo on their qualifications, the Court took under advisement the issue of whether the witnesses were qualified as experts to render an opinion on the length of the Track.  See N.T. 148:18-22; 264:20-23.  The Court also took under advisement the parties' Daubert objections.

7. Pursuant to Federal Rule of Evidence 702 ("Testimony of Experts"):

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably
> to the facts of the case.

Trial judges are charged with the responsibility of acting as gatekeepers to exclude unreliable expert testimony.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); see also Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments.  This gatekeeper function applies to all expert testimony, not just testimony based in science.  Kumho Tire Co. v. Carmichael, 526 U.S.

16

137 (1999).[2]  Moreover, the admissibility of all expert testimony is governed by the principles in Fed. R. Evid. 104(a).   Under this Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.  See Bourjaily v. United States, 483 U.S. 171 (1987); Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments.

8.   For the reasons to be discussed the Court finds that Guzzi and DiGeronimo are qualified experts and their methodology and testimony are sufficiently reliable to be admissible.

9.   With regard to Guzzi and DiGeronimo, the Court finds that (1) their testimony is based upon sufficient facts or data, (2) their testimony is the product of reliable principles and methods, and (3) they applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.

10.  The Third Circuit has "interpreted the specialized

---

[2]Daubert sets forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony (hereinafter referred to as the "Daubert Test").  "The specific factors identified in Daubert are (1) whether the expert's technique or theory can be or has been tested---that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community."  Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments, citing Daubert, supra. "The Court in Kumho held that these factors might also be applicable in assessing the reliability of non-scientific expert testimony, depending upon 'the particular circumstances of the particular case at issue.' 119 S.Ct. at 1175." Id.

knowledge requirement liberally" and has held that the basis of specialized knowledge required by Fed. R. Evid. 702 "can be practical experience as well as academic training and credentials." Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 327-328 (3d Cir. 2002)(internal quotation marks and citation omitted). However, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman...." Id. Further, "a broad range of knowledge, skills, and training" will qualify a witness as an expert and, therefore, the Third Circuit has expressly "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more general qualifications." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). As such, the qualifications requirement has generally been liberally construed by courts in this circuit. Id.; Holbrook v. Lykes Bros. Steamship Co., Inc., 80 F.3d 777, 781 (3d Cir. 1996); Hammond v. International Harvester Co., 691 F.2d 646, 653 (3d Cir. 1982). Furthermore, when making a preliminary determination with respect to the admissibility of expert testimony, a court must "solely focus on the principles and methodology, not on the conclusions they generate." Daubert, 509 U.S. at 595. "The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 806 (3d Cir. 1997).

11. DMA and Boro argue that Guzzi lacks the requisite

18

knowledge, skill, experience, training and education with regard to
track design, measurements, layout or certification to testify as
an expert at trial. (N.T. 147:23-25 to 148:1). Specifically, DMA
argues that Guzzi "doesn't have the particular expertise in this
particular discipline with respect to running tracks, because none
of the tracks which he designed or certified were broken-back
tracks." (N.T. 148:5-9). DMA and Boro also challenge the
methodology employed by Guzzi, by arguing that he did not comply
with the standards set by the certifying bodies for competitive
running tracks. See N.T. 146:21-25 to 147:1-14.

12. The Court finds that Lenape satisfied its burden of
establishing the admissibility of its expert's opinions, and his
qualifications, by offering the following facts: Guzzi is a licensed
professional civil engineer in the State of New Jersey and
Washington D.C. (N.T. 131:17-22) as well as a certified municipal
engineer in New Jersey (N.T. 134:3-12); he has been a professional
engineer for nearly twenty (20) years (N.T. 132:17), and established
his own civil engineering and surveying firm seventeen (17) years
ago (N.T. 134:16-17); he has worked extensively with school
districts (N.T. 135:9-20); and his firm has "designed and prepared
bid documents and oversaw construction on several new tracks, as
well as the reconstruction or resurfacing of existing tracks" (N.T.
135:25 to 136:1-3). Guzzi also provided testimony regarding the
methodology his firm employs when they measure a track. (N.T. 136:4
to 139:11). Although Guzzi may not have extensive experience with

19

broken back tracks, the Court does not find this essential in order to be qualified to measure the Track.   Nevertheless, as will be discussed, this is relevant to the weight and credibility of his testimony.

13.   Lenape objects to the qualification of DiGeronimo as an expert witness by noting that DiGeronimo is not a licensed land surveyor or engineer, is not currently a certified track builder, and does not have any college or professional degrees.   (See N.T. 257:9-25; 258:1-25; 259:1-23).

14.   Likewise, the Court finds that DMA satisfied its burden regarding DiGeronimo's qualifications as an expert.   DiGeronimo explained that he has decades of experience in the field of sports building as a "sports facility consultant."   (N.T. 250:16). Although he did not graduate college, DiGeronimo took courses in civil engineering at the University of Detroit, and participated in the "Cooperative Engineering Program" at that institution.   (N.T. 250:22 to 251:3).   DiGeronimo went on to be involved in the formation of various ventures, including "Architects DiGeronimo," "DiGeronimo and Mikula Associates," and "DiGeronimo Sports Engineering," all of which engaged in consultation on athletic facilities.   DiGeronimo has held appointments with several organizations, including the United States Tennis and Track Builders Association, the Synthetic Turf Council, and the International Association of Athletics Federations, among others.   (N.T. 252:19 to 253:19).   He has also authored publications and standards

20

regarding 400-meter tracks, and he "personally developed the standard for equal quadrant tracks [and] inaugurated or helped invent the broken-back curve design or the double bend track." (N.T. 254:23-25). DiGeronimo has held special assignments for the government, including "working for approximately 16 years on sports facilities for the White House and Camp David," and for the Olympics, where he did the "construction oversight and design of the synthetic fields for the 1996 Atlanta Olympic Games and . . . assist[ed] the track contractor in his layout of the actual stadium and the other eight tracks for Olympic competition." (N.T. 255:10-24).

15. Having found both Guzzi and DiGeronimo to be qualified expert witnesses pursuant to Fed. R. Evid. 702, and having found their testimony and methodology to be sufficiently reliable to be admissible pursuant to Daubert, the Court will proceed to evaluate the substance of the experts' testimony.

16. The crux of the issue before the Court is whether the Track as originally built and lined measured 400 meters. Although it would seem that the measurement of a track is straightforward, this litigation demonstrates that this is not the case. Here we have a situation where two qualified experts disagree on the length of the Track and the Court is left to decide which expert to believe. If the Court credits Guzzi's testimony then Lenape succeeds on the crux of its case. If the Court credits DiGeronimo's testimony then Boro and DMA succeed.

17.   Although the issue is not free from doubt, the Court credits DiGeronimo's testimony over Guzzi and finds that Lenape has not satisfied its burden of proving by a preponderance of the evidence that Boro breached the Contract by not providing it with a 400-meter track.  The Court finds that the Track as originally layed out by DMA and lined by Tri-Tec met the Contract specifications and conformed to the contractual requirements.

18.   In deciding to credit DiGeronimo's opinion over Guzzi, the Court gives weight to the fact that DiGeronimo has substantially more relevant experience measuring broken-back tracks than does Guzzi.  Not only did DiGeronimo help invent the broken-back curve or the double bend track (N.T. 254:24-25), but he has been certifying tracks for competitive uses going back to the late 1970's. (N.T. 254:24 to 256:9).  In addition, DiGeronimo has built tracks.  (N.T. 259:11 to 260:2).

19.   In comparison to DiGeronimo, and while Guzzi may be a competent civil engineer when dealing with site development work, his expertise regarding laying out, lining and measuring broken-back tracks, and his experience with NFSHSA and IAAF requirements, is limited.  In the Court's view this limited experience reflected on the quality of the relevant work he performed for Lenape.  Other than Seneca, Guzzi has never certified a broken-back track for competitive use.  (N.T. 203:18-22).  In addition, Guzzi does not lay out tracks.  (N.T. 216:8-11).  Also, while Guzzi owns a general civil engineering firm that does site development work (N.T. 134:18-

22

20), DiGeronimo specializes in the design of sports facilities and has been involved with running tracks for decades. (N.T. 250:20 to 257:1).

20. Not only does DiGeronimo have more relevant experience than does Guzzi with regard to measuring tracks, but he also presented a logical and credible explanation of how he personally laid out the original lane markings and later verified that the Track as originally laid out and lined met the required specifications in the Contract. In addition, he explained how he personally verified that his work product was correct. When DiGeronimo visited the Track in 2009 the original striped lines on the Track were visible through the new surface. (N.T. 292:21-23). Therefore, he was able to measure and compare the new lines striped on the Track against his original lines. DiGeronimo established the radii, he established the point of curve, measured the straight away and measured the angle of the small and large radii. (N.T. 294:15 to 298:10). Based on these calculations and measurements he concluded that the original striped lines were accurate and complied with the specifications in the Contract. (N.T. 14-15). In addition, DiGeronimo also determined that the current lines did not meet NFSHSA and IAAF requirements. (N.T. 298:1-22).

21. Guzzi used a different method to measure the Track than did DiGeronimo. Rather than establish radii, points of tangency, point of curve, etc., Guzzi arranged for the Track to be surveyed. See JE 26. Guzzi arranged for a surveyor to take "shots" at the

Track and then used a computer program to compute the length of the Track.  The problem with Guzzi's methodology, however, is that he took his measurements from the wrong location.

22.  In order to be certified, the Track had to measure 400 meters from the "measure line."  The measure line is an invisible line offset 20 centimeters from the inside striped lane.  Guzzi unequivocally testified that the 20 centimeters was measured from the "center" of the inner painted line.  (N.T. 206:4-9; 216:23 to 217:21).  However, this is an incorrect measurement.  The NSFHSA Court and Field Diagram Guide (JE 24) requires that the 20 centimeter measurement by taken from the inner edge of the innermost line.  (Id. at 33).  Thus, the measurements Guzzi relied upon to conclude that DiGeronimo's layout was too long were incorrect.

23.  After Guzzi was confronted with his error he corrected himself during Lenape's rebuttal case and testified that his survey was taken from the correct location.  (N.T. 343:24 to 344:4). However, the Court rejects this testimony.  Before Guzzi changed his testimony he did not learn any new information.  For example, he did not review any documents or speak with any witnesses to refresh his recollection about what occurred.  (N.T. 349:15 to 350:17).  It is apparent to the Court that Guzzi simply changed his testimony when he was confronted with a glaring error.  This change negatively impacted the weight and credibility of the entirety of Guzzi's testimony.

24.  Apart from the foregoing survey mistake and change in

24

testimony, the Court doubts the credibility of Guzzi's opinions for other reasons. The Contract specifications required that all line marking dimensions be certified in accordance with the governing sanctioning body (IAAF, NCAA, NFSHSA & USAT&F). In fact, TDC undertook to assure that the design of the original Track met IAAF guidelines. See October 18, 2002 Letter, JE 18. Nonetheless, Guzzi admits that the Track as it is currently marked and lined is not certifiable pursuant to IAAF standards because the radius angle is greater than 60 degrees. (N.T. 354:11-14; JE 35). Although Guzzi testified that he was only concerned that the Track met NFSHSA standards, this is not what was required in the Lenape/Boro Contract. In addition, Guzzi contradicted himself because he also testified that his drawing for the Track required 60 degrees. (N.T. 355:4-8). Also, Guzzi testified that he designed the Track so that the markings and lanes would meet NFSHSA and IAAF standards. (N.T. 355:9-12). Since Guzzi prepared the layout for the re-striping, he should have assured that the Contract met all applicable standards. The fact that Guzzi admitted this was not done is a negative reflection on his expertise. Further, on May 26, 2005, Guzzi told Lenape that after the Track was re-striped, "there would be no chance of the old striping becoming visible...." (JE 8). The evidence demonstrates that this is not the case. In addition, as noted, Guzzi was not familiar with the NFHS Court and Field Diagram Guide indicating where to measure the "measure line." See JE 24 at 33. This critical measurement should have been known by an expert

25

testifying as to the length of the Track. In sum, therefore, for all the foregoing reasons, including Guzzi's relative lack of relevant experience with tracks and his mistakes, the Court credits DiGeronimo's opinions over those of Guzzi.

25. Based upon the foregoing findings, the Court rules that Boro did not breach its Contract to provide Lenape with a certified 400-meter running track. As noted, the Court credits DiGeronimo's testimony that the Track as originally laid out and lined was 400 meters. The Court also finds that DMA's Certification was appropriate pursuant to the applicable NFSHSA guidelines because it was signed by a licensed engineer. See JE 28 at 71; N.T. 243:8-11.

26. As to Lenape's negligence claim against Boro, it is rejected. Lenape has not satisfied its burden of proving the Track as originally laid out did not measure 400 meters. Further, Lenape cannot pursue a negligence claim against Boro because Boro did not owe Lenape a duty independent of the Contract. Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 317 (2002)(citing New Mea Constr. Corp v. Harper, 203 N.J. Super. 486, 493-94 (App. Div. 1985); Int'l Minerals & Mining Corp. v. Citicorp North Am., Inc., 736 F. Supp. 587, 597 (D.N.J. 1990)).

27. As to Boro's third-party claim, it fails for the reason that it has not been proven that DMA did not do what was asked of it.

26

Conclusion

Based on the foregoing findings, and for all the reasons discussed herein, the Court finds: (1) in favor of Boro in the amount of $10,916.61 on its contract claim against Lenape; (2) in favor of Boro on Lenape's breach of contract and negligence counterclaim; and (3) in favor of DMA on Boro's claim for contribution and indemnity. A Judgment consistent with this Memorandum of Decision will be entered.


s/Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Dated: December 23, 2010.